**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

STATE OF NEW YORK,

Plaintiff,

– against –

UNITED STATES DEPARTMENT OF THE INTERIOR, 1849 C Street, N.W., Washington, D.C. 20240;

DOUG BURGUM, in his official capacity as United States Secretary of the Interior, 1849 C Street, N.W., Washington, D.C. 20240;

BUREAU OF INDIAN AFFAIRS, U.S. Department of the Interior, 1849 C Street, N.W., Washington, D.C. 20240; and

WILLIAM KIRKLAND, in his official capacity as Assistant Secretary – Indian Affairs, U.S. Department of the Interior, 1849 C Street, N.W., Washington, D.C. 20240,

Defendants.

Civil Action No. ________

**COMPLAINT**

Plaintiff State of New York (the "State"), for its Complaint against Defendants the United States Department of the Interior ("DOI"); Doug Burgum, in his official capacity as Secretary of the Interior (the "Secretary"); the Bureau of Indian Affairs; and William Kirkland, in his official capacity as Assistant Secretary – Indian Affairs (the "Assistant Secretary") (collectively, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1. The State brings this action to protect its sovereignty over its own territory, including its ability to enforce State law. As reflected in a memorandum to Bryan Bald Eagle,

Acting Regional Director, Eastern Region from William Henry Kirkland III, Assistant Secretary – Indian Affairs, on February 24, 2026, the United States Department of the Interior made a determination that a 207-acre parcel of land on Grand Island, Erie County, New York, located at 2780 Long Road / 0 Bedell Road (the "Parcel"), should be placed in restricted fee status (the "Decision") under the Seneca Nation Settlement Act of 1990, Pub. L. No. 101–503, 104 Stat. 1292, 1297 (formerly codified at 25 U.S.C. § 1774 et seq.) (the "Settlement Act"). The effect of the Decision, annexed hereto as **Exhibit A**, is to subject the Parcel to the restraint on alienation of the Nonintercourse Act, 25 U.S.C. § 177, and, pursuant to the Settlement Act and case law applying it, to constrain or divest the State of its sovereign authority to apply and enforce its laws on land that has been part of the State of New York, and subject to its exclusive jurisdiction.

2. On December 22, 2025, three days after the Parcel was conveyed to the Seneca Nation of Indians (the "Nation" or "Seneca Nation") for one dollar in what both the grantor and the Nation publicly described as a donation, the Nation invoked the Settlement Act's truncated restricted fee procedure, asserting that it had purchased the Parcel with Settlement Act funds and that the Parcel is "in near proximity to the former Buffalo Creek Reservation."

3. The Settlement Act's abbreviated procedure, under which land becomes restricted fee land by operation of law unless the Secretary determines otherwise within thirty days after a short comment period, is available only for land that: (i) is acquired by the Seneca Nation "with funds appropriated pursuant to" the Settlement Act, *i.e.*, Settlement Act funds, and (ii) is either within the Nation's aboriginal area in the State or "situated within or near proximity to former reservation land…."

4. In the Decision, DOI explicitly determined, *inter alia*, that the Parcel is (1) within the Nation's aboriginal area and is situated in near proximity to former reservation land, and (2)

was purchased with funds from the Settlement Act. However, as discussed below, those findings are incorrect, contrary to relevant facts and legal precedent, ignore the State's objections, and ignore DOI's prior actions and findings. Moreover, they further sanction a use of Settlement Act funds that the Nation expressly bargained away in Section 11 of the Nation-State Gaming Compact between the Nation and the State (the "Compact") that DOI permitted to go into effect. The Decision was arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and plainly not the product of reasoned agency decision-making.

5. As discussed in more detail below, contrary to the Decision, the Parcel satisfies neither express statutory condition of the Settlement Act, making it ineligible to be recognized in restricted fee status by DOI. Indeed, the finite, appropriated, non-replenishing Settlement Act land acquisition funds have long been exhausted, and Grand Island lies outside the Nation's aboriginal area and is not in "near proximity" to any "former reservation land" to which the Settlement Act applies.

6. Further demonstrating the flawed nature of the Decision, in a January 22, 2026, comment letter, the State informed DOI that "Settlement Act funds appropriated for the purpose of the truncated review process have been long exhausted," reminded DOI that the State had "previously and repeatedly requested an accounting of Settlement Act funds," noted that "[n]o accounting has ever been provided," and asked DOI to decline restricted fee status and to require a certified accounting. DOI did not respond to the State, did not require an accounting, and did not explain how or why the Parcel qualified before permitting the Parcel to become restricted fee land.

7. The Decision also is inconsistent with and fails to adequately account for the federally approved Compact between the Nation and the State. A copy of the Compact, along with

the Secretary of the Interior's letter deeming the Compact approved dated November 12, 2002, ("Compact Approval Letter") is annexed hereto as **Exhibit B**.

8. In the Compact, the Nation expressly agreed to use "all but five million dollars ($5,000,000.00)" of its remaining Settlement Act funds to acquire its Niagara Falls and Buffalo gaming sites, and to "dedicate" any funds remaining after those acquisitions "to the acquisition of parcels to meet the housing needs of the Nation's members," which, "[u]nless otherwise agreed by the Parties, . . . shall be physically and immediately contiguous and adjacent to" an existing reservation or one of the gaming sites. Compact §§ 11(b)(4), 11(c).

9. The Secretary reviewed the Compact in 2002 and "allow[ed] this Compact to take effect without Secretarial action." Compact Approval Letter at 1. In other words, the Secretary stated that "the Compact [was] considered to have been approved, 'but only to the extent [it] is consistent with the provisions of [the Indian Gaming Regulatory Act ("IGRA")].'" *Id.* at 7–8.

10. The Secretary reviewed the Compact with knowledge that the Compact "reserv[ed] five million dollars for housing adjacent to the gaming sites." *Id.* at 1.

11. As of now, the Nation has not articulated any intent to use the Parcel for housing. Nor is it "physically and immediately contiguous and adjacent to . . . an existing reservation of the Nation" or the Buffalo gaming site, as required by Section 11(c) of the Compact.

12. Moreover, the State, the only other "Party" to the Compact and the only entity whose agreement could waive or remove the restrictions regarding the use of Settlement Act funds to which the Nation agreed in Section 11(c) of the Compact, has never agreed to the Parcel's acquisition with Settlement Act funds. Compact §§ 1(x)–(y), 11(c). DOI nonetheless approved restricted fee status in the Decision without any reference to or consideration of the terms of the Compact.

13. Moreover, the fact that DOI was on notice of and allowed the Compact to go into effect and was aware, as of that date, November 12, 2002, that the Settlement Act funds eligible for land acquisition were already or would be exhausted entirely by the Nation's acquisition of gaming properties in the cities of Niagara Falls and Buffalo is entirely inconsistent with and renders arbitrary and capricious DOI's subsequent determination here that the Parcel was acquired in 2025 with Settlement Act funds that were available for land acquisition.

14. Notably, the Decision does not address at all the Compact and the restrictions it places on Settlement Act funds and the Nation's acquisition and use of land acquired thereunder, nor does it address at all the apparent prior exhaustion of Settlement Act funds, further demonstrating the flawed administrative decision-making engaged in here by DOI.

15. By the Decision, DOI permitted land that does not qualify under the Settlement Act to be removed from the State's sovereign jurisdiction. The Decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) and (C).

16. For these reasons, as more fully described below, the State seeks vacatur of the Decision, a declaration that the Parcel does not qualify for restricted fee status under the Settlement Act, and a declaration that the Settlement Act's land acquisition funds have been exhausted such that the Settlement Act's abbreviated restricted fee procedure is no longer available for this or any future acquisition.

## JURISDICTION

17. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701–706, and

the Settlement Act, Pub. L. No. 101–503, 104 Stat. 1292. The Court may grant declaratory and further relief under 28 U.S.C. §§ 2201 and 2202.

18. The United States has waived its sovereign immunity for this action under 5 U.S.C. § 702, which permits suits seeking relief other than money damages against an agency or officer of the United States for action taken in an official capacity.

19. The Decision constitutes final agency action within the meaning of 5 U.S.C. § 704. It marks the consummation of DOI's decision-making process on the Nation's request to subject the Parcel to 25 U.S.C. § 177, the Nonintercourse Act, and to have it held in restricted fee status, and legal rights and obligations flow from that Decision. That outcome is reviewable under 5 U.S.C. §§ 701–706.

20. Indeed, the Decision is a signed memorandum, issued by the Assistant Secretary – Indian Affairs to the Acting Regional Director, Eastern Region of DOI, that, *inter alia*, directs the Acting Eastern Regional Director to "record the deeds to the Grand Island Parcel as restricted fee." Decision at 5.

21. The State has no other adequate remedy in a court. This action is timely under 28 U.S.C. § 2401(a).

## VENUE

22. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because this is an action against an agency and officers of the United States acting in their official capacities, a substantial part of the events or omissions giving rise to the claims occurred in this District, and a substantial part of the property that is the subject of the action is situated in this District.

## PARTIES

23. Plaintiff State of New York is a sovereign State of the United States. The State brings this action in its sovereign capacity to protect its sovereign authority over its territory and its regulatory jurisdiction, as well as to protect the sovereign authority and rights of its political subdivisions.

24. Defendant United States Department of the Interior is an executive department and agency of the United States, located at 1849 C Street, N.W., Washington, D.C. 20240. DOI is responsible for administering the Settlement Act, including any restricted fee status determinations made pursuant to its provisions.

25. Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity. Section 8(c) of the Settlement Act vests in the Secretary the authority to determine that land acquired by the Nation should not be subject to 25 U.S.C. § 177 or held in restricted fee status.

26. Defendant Bureau of Indian Affairs is a bureau within DOI, located at 1849 C Street, N.W., Washington, D.C. 20240.

27. Defendant William Kirkland is the Assistant Secretary – Indian Affairs of DOI and is sued in his official capacity.

28. Defendants Burgum and Kirkland are responsible officers of the United States, and each bears responsibility for the Decision permitting the Parcel to be held in restricted fee status.

## STANDING

29. The State has standing to bring this action. The Decision inflicts concrete, particularized, and ongoing injuries to the State's sovereign interests that are fairly traceable to the Decision and would be redressed by the relief requested.

30. A State's sovereign interests include the exercise of sovereign power over the individuals and entities within its jurisdiction, which involves the power to create and enforce a legal code, both civil and criminal, and the maintenance and recognition of its borders and territory. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). Injury to those sovereign interests is a cognizable injury in fact. States are also entitled to special solicitude in a standing analysis when they seek to vindicate sovereign prerogatives and a procedural right Congress has afforded them. *See Massachusetts v. EPA*, 549 U.S. 497, 518–20 (2007).

31. The Parcel lies wholly within the territorial boundaries of the State of New York. Before the Decision, the Parcel was fully subject to the State's sovereign regulatory authority, including the State's environmental conservation laws, land use and building laws, public health and safety laws, and civil and criminal laws of general application, and to the regulatory authority the State delegates to its political subdivisions, including the Town of Grand Island.

32. As a direct result of the Decision, the Parcel became subject to 25 U.S.C. § 177 and is held in restricted fee status. DOI has taken the position that such restricted fee land acquired under the Settlement Act is "Indian country" within the meaning of 18 U.S.C. § 1151, over which the Nation has jurisdiction and which may become part of a reservation. Compact Approval Letter at 6.

33. The Decision thus, according to DOI, displaces the State's authority to apply and enforce its laws on 207 acres of State territory.

34. The Second Circuit has concluded, with respect to parcels placed into restricted fee status under the Settlement Act, that the State is "divested of its jurisdiction." *Citizens Against Casino Gambling in Erie Cnty. v. Chaudhuri*, 802 F.3d 267, 283–84 (2d Cir. 2015). Putting aside the degree of that divestment, or any exceptions to it, it is well settled that when a State is prevented

by federal law from enforcing its own laws, it experiences sovereign injury (and, indeed, irreparable injury). *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (cleaned up) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022) ("States have a sovereign interest to sue the United States when a federal regulation purports to preempt state law."). The State's loss of regulatory authority is immediate and concrete pursuant to the Second Circuit's decision in *Chaudhuri* and other authorities.

35. By way of example only, the following types of sovereign authority may also be impaired by the Decision:

(a) State regulation of freshwater wetlands by the New York State Department of Environmental Conservation ("DEC") under Article 24 of the New York Environmental Conservation Law;

(b) State ability to enforce its environmental and public health laws, including those governing development and discharges on the Parcel with respect to public sewage and stormwater drainage and sewer systems; and

(c) Impairment of the State's sovereign authority, through the Town of Grand Island, to impose real property taxes, which are a function of state statute (New York Real Property Tax Law).

36. The Decision creates an isolated enclave of asserted tribal jurisdiction on an island in an international boundary waterway, creating a checkerboard of jurisdiction that the State must now navigate and risking a further jurisdictional patchwork.

37. The Decision also threatens the State's sovereign and contractual interests under the Compact. The Nation's use of Settlement Act funds for land acquisition, and the location and use of land so acquired, are governed – indeed limited – by Sections 11(b) and 11(c) of the Compact. The Decision is inconsistent with and ignores the terms of the Compact, fails to account for the evidence that the Nation's acquisitions of gaming-related land under the Compact long ago exhausted the Settlement Act funds, deprives the State of the benefit of its bargain under a federally approved compact and impairs the State's sovereign right to enforce the limits on which it agreed to support Settlement Act acquisitions.

38. The Decision also injures the State's procedural rights under the Settlement Act. Congress conditioned the abbreviated restricted fee procedure on notice to State and local governments and an opportunity to comment. The State submitted timely comments objecting to the Nation's request and requesting an accounting of Settlement Act funds, but DOI did not respond to those comments in any communication to the State, and the State never received a copy of the Decision directly from DOI or any communication from DOI regarding its disposition of the Nation's request for restricted fee status for the Parcel. The State obtained a copy of the Decision through other means.

39. The State's injuries are fairly traceable to the Decision. But for the Decision, the Parcel would not be subject to 25 U.S.C. § 177 or held in restricted fee status, and the Nation would not have the Decision as a basis to assert sovereign jurisdiction over the Parcel.

40. The State's injuries are redressable by a favorable decision. Vacatur of the Decision would restore the Parcel to its prior status as fee simple land subject to the State's full sovereign and regulatory jurisdiction.

## FACTUAL ALLEGATIONS

### A. The Grand Island Parcel

41. Grand Island is an island of approximately 19,000 acres located in the Niagara River in Erie County, New York. It is connected to the mainland by the I-190 bridge system. The Niagara River, an international boundary waterway, separates Grand Island from Canada and from the City of Niagara Falls, New York.

42. The Parcel consists of approximately 207 acres located at 2780 Long Road / 0 Bedell Road in the Town of Grand Island (tax map nos. 23.00-1-50 and 23.00-1-26.1), on the west side of I-190. Approximately 141 acres of the Parcel are zoned for industrial use and approximately 66 acres in the western portion of the Parcel are zoned for residential use.

43. The Parcel contains freshwater wetlands, including Wetland M, a DEC-regulated freshwater wetland under Article 24 of the Environmental Conservation Law.

44. The Parcel also houses public sewage and stormwater drainage infrastructure, including a pump station, that serve surrounding residential properties and prevent stormwater flooding, and that are subject to recorded easements in favor of the Town of Grand Island.

45. By Warranty Deed with Lien Covenant dated December 19, 2025, and recorded in the Erie County Clerk's Office on December 23, 2025, the grantor conveyed the Parcel to the Seneca Nation for stated consideration of "One and 00/100 ($1.00) Dollars and other valuable consideration…." A copy of the deed is annexed hereto as **Exhibit C**.

46. The Real Property Transfer Report (Form RP-5217) filed with the deed reports a full sale price of $1.00; identifies the property as non-residential vacant land with a total assessed value of $1,116,200; and describes the transfer as a "Land Donation."

47. The conveyance was publicly described by both the grantor and the Nation as a donation of the Parcel to the Nation. Such a donation is plainly not an acquisition "with funds

appropriated pursuant to” the Settlement Act; further, treating the $1.00 payment here as satisfying the Settlement Act would render the Act’s finite appropriation virtually meaningless.

**B. The Seneca Nation Settlement Act of 1990**

48. Congress enacted the Settlement Act in 1990 to resolve land-related disputes arising from the 99-year leases of Seneca Nation lands in and around the City of Salamanca, New York, under which the Nation received below-market rents, and to provide for the continued occupancy of those lands by non-members.

49. The Settlement Act defines “Seneca Nation” as the “Seneca Nation of Indians of the Allegany, Cattaraugus, and Oil Springs Reservations[.]” Settlement Act § 3(7), 104 Stat. at 1294. The Settlement Act does not confer benefits or rights on any other Seneca entity or with respect to any other reservation.

50. The Settlement Act provides for settlement funds from two sources. The United States was to pay the Nation $30 million as “the Federal share of the cash payment to be managed, invested, and used by the Nation,” and $5 million for economic and community development. Settlement Act § 6(b)(1)–(2), 104 Stat. at 1295–96. The State was to provide $16 million in cash payments and $9 million for economic or community development. Settlement Act § 6(c), 104 Stat. at 1296. The total amount therefore allocated to the Nation for purposes of land acquisition in accordance with Section 8(c) of the Settlement Act was, at most, $46 million ($30 million Federal share and $16 million State share). The remainder of Settlement Act funds – $14 million – was specifically allocated for economic and community development purposes ($5 million Federal share and $9 million State share).

51. The Settlement Act limits the funds available: "The only amounts available to carry out this Act shall be those amounts specifically appropriated by the Congress or the legislature of the State to carry out this Act." Settlement Act § 6(e), 104 Stat. at 1296.

52. Section 8(c) of the Settlement Act conditions restricted fee status on three requirements: (a) that the land be acquired "with funds appropriated pursuant to this Act"; (b) that the land be "within [the Nation's] aboriginal area in the State" or "situated within or near proximity to former reservation land"; and (c) that notice be provided to State and local governments. Settlement Act § 8(c), 104 Stat. at 1297.

53. The Settlement Act contains no mechanism for replenishing the funds it appropriated, demonstrating the clear intent that they were finite.

54. Section 8(c) of the Settlement Act provides that land within the Nation's aboriginal area in the State or situated within or near proximity to former reservation land may be acquired by the Seneca Nation with funds appropriated pursuant to the Settlement Act, and that such land may become part of the Allegany, Cattaraugus, or Oil Springs reservations.

55. Section 8(c) further provides that State and local governments shall have a period of thirty days after notification by the Secretary or the Seneca Nation of the acquisition of, or intent to acquire, such lands to comment, and that, unless the Secretary determines within thirty days after the comment period that such lands should not be subject to 25 U.S.C. § 177, such lands shall be subject to that provision and shall be held in restricted fee status by the Seneca Nation.

56. The abbreviated procedure in Section 8(c) is available only where the statutory predicates – including acquisition with Settlement Act funds *and* location within the Settlement Act's geographic limits – are satisfied.

57. The legislative history of the Settlement Act reflects that its land acquisition provision was designed to address a specific and localized problem: the loss of Seneca lands in the vicinity of the Allegany, Cattaraugus, and Oil Springs reservations, including the taking of 10,000 acres of the Allegany Reservation for the Kinzua Dam Project in the 1960s. H.R. Rep. No. 101-832, at 2–3 (1990). The House Report observed that "nearly one-third of the Seneca Nation's Allegany Reservation was lost through construction of the Kinzua Dam Project in the mid-1960's." *Id.* at 7.

58. The geographic limitations in Section 8(c), restricting acquisitions to land "within its aboriginal area in the State or situated within or near proximity to former reservation land," were not included in the initial draft of the legislation. They were added after the State and local governments raised concerns that the provision would allow the Nation to acquire significant amounts of land and remove it from State and local jurisdiction and tax rolls. *See* Renegotiation of Seneca Nation Leases: Hearing on S. 2895 Before the S. Select Comm. on Indian Affairs, 101st Cong. 43 (1990) (statement of Dennis Tobolski, Cattaraugus County Attorney); *id.* at 69 (statement of Stan Lundine, Lieutenant Governor, State of New York) (S. Hrg. 101-1186).

## C. The Seneca Nation's Lands and Its Lack of Any Historical Connection to Grand Island

59. In aboriginal times, the Senecas were the westernmost tribe of the Iroquois Confederacy but were located a considerable distance to the east of the Niagara River. *See Seneca Nation of Indians v. New York*, 206 F. Supp. 2d 448, 458 (W.D.N.Y. 2002), *aff'd*, 382 F.3d 245 (2d Cir. 2004), *cert. denied*, 547 U.S. 1178 (2006).

60. At the time of first European contact, the land portion of the Niagara region was occupied, at least in part, by the Neutral Nation of Indians. Archaeological evidence confirms that the Neutrals lived on Grand Island, including a Neutral cemetery dating from 1635 to 1645

containing at least 60 burial sites. "In contrast, there is no archaeological evidence that the Senecas were ever actually present on Grand Island." *Id.* at 457–58.

61. After the Senecas defeated the Neutral Nation of Indians and other tribes in the mid-seventeenth century, and the Wenros withdrew, the territory between the Genesee and Niagara Rivers remained an unoccupied wilderness, and there was no permanent Seneca occupancy of the country west of the Genesee River for almost a century. *Id.* at 458–59. The Senecas "did not permanently occupy the Niagara region, but instead used it as a seasonal hunting and fishing grounds," and other Indians also used the region as an avenue of communication and transportation. *Seneca Nation*, 382 F.3d at 249–50.

62. At the beginning of the Revolutionary War, the Senecas, except for those working on the Niagara portage, were still living on their original homelands along the Genesee River, some sixty miles to the east of the Niagara River. *Seneca Nation*, 206 F. Supp. 2d at 470.

63. In the treaties of April 3 and August 6, 1764, which ended the Senecas' participation in Pontiac's Rebellion, the Senecas ceded to the British Crown a four-mile-wide strip of land on each side of the Niagara River from Lake Ontario to Lake Erie, together with the Niagara River islands, including Grand Island. *Id.* at 508–10; *Seneca Nation*, 382 F.3d at 251–52, 260–61. This Court and the Second Circuit held that the 1764 treaties manifested a plain and unambiguous intent to extinguish any title the Senecas *may* have had to the Niagara Islands – they did not explicitly find that the Senecas indeed possessed aboriginal title to lands including Grand Island. *Seneca Nation*, 206 F. Supp. 2d at 509–10; *Seneca Nation*, 382 F.3d at 259–62.

64. The 1797 Treaty of Big Tree established the Seneca reservations in western New York, including the Allegany, Cattaraugus, Oil Springs, Tonawanda, and Buffalo Creek reservations, by reserving those tracts from the Seneca Nation's 1797 conveyance of much of its

western New York territory. The Niagara Islands, including Grand Island, were not among the lands established as Seneca reservations. No treaty, statute, or executive order has ever designated Grand Island as a Seneca reservation.

### D. The Nation's Prior, Unsuccessful Claim to Grand Island, in Which the United States Participated

65. In 1993, the Seneca Nation filed suit in this Court against the State of New York and others, claiming that the State's 1815 acquisition of the Niagara Islands, including Grand Island, violated the Nonintercourse Act, 25 U.S.C. § 177, and seeking to establish the Nation's continuing interest in the islands. The Tonawanda Band of Seneca Indians and the United States, as trustee for the Senecas, intervened as plaintiffs. *Seneca Nation*, 206 F. Supp. 2d at 453–54; *Seneca Nation*, 382 F.3d at 248 n.1.

66. On June 21, 2002, this Court (Arcara, J.) granted summary judgment to the State and the other defendants and dismissed the case in its entirety, holding that the Niagara Islands were not Seneca tribal land in 1815 because any title the Senecas may once have held, including aboriginal title, had been extinguished long before, resulting in New York obtaining full fee title to the islands before 1815. *Seneca Nation*, 206 F. Supp. 2d at 453–54, 508–42.

67. The Court noted that, before the Indian Claims Commission ("ICC"), the United States itself had argued that the Senecas had no property interest in the Niagara Islands in 1815, that any Seneca interest had been extinguished on numerous occasions before 1815, and that the Senecas had ceded any interest in the islands on at least eight different occasions before 1815. *Id.* at 499–500, 515–16, 540.

68. The Second Circuit affirmed on September 9, 2004, holding that the August 1764 Treaty extinguished any title to the Niagara Islands the Seneca may have had, that British title passed to New York after the Revolution, and that neither the 1784 Treaty of Fort Stanwix nor the

1794 Treaty of Canandaigua divested New York of its title to those lands. *Seneca Nation*, 382 F.3d at 260–61, 264–68, 272. The Supreme Court denied certiorari. *Seneca Nation*, 547 U.S. 1178 (2006).

69. The United States, through DOI and the Department of Justice, was a party to that litigation and is bound by its outcome; however, as discussed below, the Decision is contrary to findings in that case and/or otherwise mischaracterizes and/or misconstrues the case's findings concerning the Senecas' aboriginal lands.

### E. The Nation's Other Lands in Western New York

70. At the time the Settlement Act was enacted in 1990, the Allegany, Cattaraugus, and Oil Springs Reservations were the only remaining reservations of the Seneca Nation.

71. The Tonawanda Reservation, established by the 1797 Treaty of Big Tree, is not a Seneca Nation reservation. It is governed by the Tonawanda Band of Seneca Indians, a separately recognized Indian nation that split from the Seneca Nation in the nineteenth century following the 1838 and 1842 Buffalo Creek treaties. *Seneca Nation*, 206 F. Supp. 2d at 453–54 & n.2, 525 n.54. The Tonawanda Reservation is therefore not among the reservations to which the Settlement Act applies and it cannot be used to assess "near proximity to former reservation land" under the statute.

72. Under the 1838 and 1842 Buffalo Creek treaties, the Buffalo Creek Reservation was ceded, and only the Allegany and Cattaraugus Reservations were restored to the Seneca Nation. *Id.* at 524–25. Even assuming the Settlement Act covers the historic Buffalo Creek Reservation, upon information and belief, the Buffalo Creek Reservation did not encompass Grand Island and was concentrated in what is now South Buffalo and West Seneca, separated from the

Parcel by the Niagara River and miles of densely developed urban territory. The Parcel is therefore not in "near proximity" to the former Buffalo Creek Reservation.

73. The Nation's Niagara Falls Territory, a gaming parcel of approximately 56 acres in the City of Niagara Falls, was acquired beginning in 2002 pursuant to the Compact, with the agreement and assistance of the State. It is not "former reservation land" within the meaning of the Settlement Act. Upon information and belief, it is approximately 12 miles by road from the Parcel and is separated from the Parcel by the Niagara River.

74. The Nation's current Buffalo Creek Territory, a parcel of approximately nine acres in the City of Buffalo, was acquired in or about 2005 pursuant to the Compact, fifteen years after the enactment of the Settlement Act. It is not "former reservation land" within the meaning of the Settlement Act. Upon information and belief, it is approximately 16 miles from the Parcel and is separated from the Parcel by the Niagara River and the City of Buffalo.

**F. The Nation-State Gaming Compact**

75. The Nation and the State executed the Compact on August 18, 2002.

76. By letter dated November 12, 2002, the Secretary informed the Nation and the State: "I have decided to allow this Compact to take effect without Secretarial action." As a result, the Compact was "considered to have been approved, 'but only to the extent the compact is consistent with the provisions of [IGRA].'" Compact Approval Letter at 1, 7–8.

77. The Compact authorized the Nation to establish gaming facilities at a site in the City of Niagara Falls, at a site in the City of Buffalo, or at such other site as may be determined by the Nation in the event a site in the City of Buffalo is rejected by the Nation for any reason, and on current Nation reservation territory. Compact § 11(a)(1)–(3).

78. The Nation agreed to use "all but five million dollars ($5,000,000.00)" of any remaining Settlement Act funds to acquire the Niagara Falls and Buffalo gaming sites, and to dedicate any funds remaining after those acquisitions to housing parcels that, "[u]nless otherwise agreed by the Parties," are "physically and immediately contiguous and adjacent to" an existing reservation or a gaming site. *Id.* §§ 11(b)(4), 11(c).

79. The Compact may be "amended or modified by written agreement of the Nation and the State." *Id.* § 16(a). The State has never agreed, in writing or otherwise, to modify Sections 11(b)(4) or 11(c), or to permit the use of Settlement Act funds to acquire the Parcel.

80. The Nation used Settlement Act funds to acquire the Niagara Falls and Buffalo gaming sites, consistent with Section 11(b)(4).

81. The Parcel is not physically and immediately contiguous and adjacent to any existing reservation of the Nation or to any designated gaming site. Upon information and belief, the Seneca Niagara Resort & Casino is approximately 12 miles by road from the Parcel, across the Niagara River; the Seneca Buffalo Creek Casino is approximately 16 miles from the Parcel, across the Niagara River and through the City of Buffalo; and the Seneca Allegany Resort & Casino in Salamanca is approximately 61 miles from the Parcel.

82. Section 11(c) further requires the State to support the Nation in the development of such housing projects and to support any notification made by the Nation under Section 8 of the Settlement Act for a housing development for Nation members.

83. The Nation's December 22, 2025 notice did not state that the Parcel would be used to meet the housing needs of the Nation's members, and, upon information and belief, the Nation has not identified any intended use of the Parcel to the State. Upon information and belief, most of the Parcel is zoned for industrial use.

**G. The Exhaustion of Settlement Act Funds and the State's Longstanding, Unanswered Requests for an Accounting**

84. As referenced above, based on the provisions of the Compact, and as set forth below, the Nation's prior land acquisitions using Settlement Act funds exhausted the funds appropriated for land acquisition long before the acquisition of the Parcel by the Nation.

85. In 2002, pursuant to a negotiated agreement with the State, the Nation acquired the Niagara Falls Convention and Civic Center and surrounding property in the City of Niagara Falls for its Niagara Falls gaming facility, which opened as the Seneca Niagara Casino on December 31, 2002. As part of that transaction, the Nation was required to satisfy outstanding general obligation bonds incurred in connection with construction of the Convention Center, which had a value of $23.9 million at the time of payment and for which the State agreed to accept an early, discounted payment of approximately $22.0 million. In addition, the State assisted the Nation in acquiring an approximately 50-acre footprint in Niagara Falls through eminent domain, for which approximately $31.5 million was paid to condemnees, and the Nation reimbursed the State from Settlement Act funds. These facts were summarized by the State in a November 29, 2011 letter from the State to then-Assistant Secretary – Indian Affairs, Larry Echo Hawk, responding to the Nation's notification that it intended to place approximately 54.62 acres in the Town of Collins, Erie County, in restricted fee status under the Settlement Act. A copy of the State's November 29, 2011 letter was annexed to the State's letter to DOI dated January 22, 2026 objecting to the Parcel being classified as restricted fee land. A copy of the State's January 22, 2026 objection letter, with attachments, is annexed hereto as **Exhibit D**.

86. Thus, prior to the Decision, DOI was plainly on notice of the State's position that the Settlement Act funds had been exhausted by the time of the Nation's acquisition of the Parcel

– and DOI evidently did not consider those facts or that issue of exhaustion of funds at all in making the Decision.

87. To summarize, upon information and belief, the Nation expended approximately $53.5 million of Settlement Act funds in connection with the Niagara Falls acquisitions alone, exceeding the, at most, $46 million of funds appropriated for land acquisition under Section 8(c) of the Settlement Act.

88. On October 3, 2005, the Seneca Gaming Corporation purchased a nine-acre parcel in the City of Buffalo for $4.6 million and resold it to the Nation for $4 of Settlement Act funds. Upon information and belief, following that related-party transaction, former Associate Deputy Secretary of the Interior James E. Cason caused the Settlement Act funds to be audited to determine the balance remaining. Upon information and belief, that audit determined that the fair market value of acquired property, rather than a fractional or nominal related-party purchase price, must be used in accounting for Settlement Act expenditures, and found that the Settlement Act funds were fully depleted. *See* Exhibit D, November 29, 2011 Letter from the State to then-Assistant Secretary Echo Hawk, at 3.

89. Upon information and belief, according to the Seneca Gaming Corporation Form 10-K for the Fiscal Year ended September 30, 2009, as filed with the United States Securities and Exchange Commission, the Nation has made additional land purchases in the vicinity of its gaming facilities, including approximately two acres and a hotel property within the Niagara Falls footprint for $7.9 million in December 2005, and a two-block section of Fulton Street in Buffalo for $631,600 in November 2006. *See id.* at 3 n.7. There is no record that DOI ever considered whether any of those acquisitions depleted Settlement Act funds such that there may have been none left at the time of the Decision.

90. In its November 29, 2011 letter to then-Assistant Secretary Echo Hawk, the State explained that the Nation had provided no evidence that Settlement Act funds had been used to purchase the Collins parcel, that, to the State's knowledge, there had been no public accounting of Settlement Act monies, that the State understood DOI had found the funds fully depleted, and that the tabulation of the Nation's historic land expenditures "well exceeds the full 1990 Act appropriation." *Id.* at 2, 4. The State urged the Secretary to delay any determination "until an accounting of the Act funds balance has been provided to both State and local governments and each has a reasonable opportunity to respond to same." *Id.* at 4.

91. The State's 2011 letter also explained that use of fair market value is the only logical accounting method for calculating Settlement Act expenditures, because permitting a fractional purchase price basis "could lead to an infinite drain on local real property tax rolls and obviate any utility in State and local government commentary, thwarting Congressional intent [as expressed in the Settlement Act]." *Id.*

92. Some 21 months later, the State received a reply from DOI's Office of Indian Gaming stating only that the Nation had withdrawn the Town of Collins parcel from DOI's consideration in February 2013. No accounting was provided to the State at that time.

93. By letter dated September 9, 2016, to then-Acting Assistant Secretary – Indian Affairs Lawrence S. Roberts regarding a renewed plan by the Nation to place parcels in the Town of Collins into restricted fee status, the State noted that it had still not received any accounting of the Settlement Act funds balance, and renewed the State's request that the Secretary delay any determination until the State had been provided an opportunity to review and comment on an accounting of the Settlement Act funds balance. A copy of the State's September 9, 2016 letter was annexed to the State's letter dated January 22, 2026 to DOI objecting to the Parcel being

classified as restricted fee land. *See* Exhibit D, Letter from the State to then-Acting Assistant Secretary Roberts.

94. To summarize, DOI has never provided the State with an accounting of Settlement Act funds, never disclosed the methodology by which it has calculated any remaining balance, and never responded substantively to the State's requests.

**H. The Nation's Notice and the State's Objection**

95. On December 22, 2025, the Nation provided notice to the State and the Town of Grand Island of its intent to have the Parcel placed in restricted fee status pursuant to the Settlement Act. The notices asserted that the Parcel "is in near proximity to the former Buffalo Creek Reservation and the existing facility that was approved pursuant to Section 11(a)(2) of the Seneca Nation-New York Compact," and that the Nation "used Seneca Settlement Act funds to purchase the Grand Island Parcel." A copy of the notice to the State is annexed hereto as **Exhibit E**.

96. The Nation's notice to the State did not disclose the purchase price, the size of the Parcel, the amount of Settlement Act funds purportedly used, any remaining balance of Settlement Act funds, or the Nation's intended use of the Parcel. It also did not assert that the Parcel lies within the Nation's aboriginal area. *See id.* In an apparent effort to satisfy the geographic requirements of the Settlement Act, the letter noted that the Parcel is "in near proximity to the former Buffalo Creek Reservation and the existing [gaming] facility that was approved pursuant to Section 11(a)(2) of the Seneca Nation-New York Compact." *Id.*

97. On January 22, 2026, within the thirty-day comment period, the State, through the Executive Chamber, submitted a comment letter to Secretary Burgum objecting to the Nation's request. *See* Exhibit D.

98. The State objected in its January 22, 2026 letter, stating that, "as the State has long contended, including in prior correspondence with the Department, Settlement Act funds appropriated for the purpose of the truncated review process have been long exhausted," and that "[t]he use of Settlement Act proceeds for Niagara Falls land acquisition in 2002 alone exhausted Act funds." *Id.*

99. The State's letter further stated that "[t]he State has previously and repeatedly requested an accounting of Settlement Act funds to address this concern," attaching its 2011 and 2016 letters to DOI, and that "[n]o accounting has ever been provided." *Id.*

100. The State's letter also objected that the Nation's purported use of Settlement Act funds to acquire the Parcel at a price far below market value raised additional concerns, because permitting a purchase on a fractional purchase price basis and then converting the property to restricted fee status "could lead to an infinite drain on local real property tax rolls and obviate any utility in State and local government commentary, thwarting Congressional intent." *Id.*

101. The State's letter concluded that these facts "give rise to a substantial concern that the Settlement Act is being improperly used to justify the acquisition of property to be put in restricted fee status," and requested that DOI "decline to permit the Property be placed into restricted fee status and, further, require the Nation to provide a certified accounting of its use of Settlement Act funds to date, with the State being able to review and comment upon such accounting." *Id.*

## I. The Decision

102. In the Decision, DOI initially found that the Parcel met the geographic condition of the Settlement Act, concluding that the Parcel is within the Nation's aboriginal area and is situated in near proximity to former reservation land.

103. In support of its determination regarding the Parcel being in the Nation's aboriginal area, DOI noted that:

> The Nation's aboriginal lands were recognized by Congress in the Settlement Act as "centered on what is now New York State." Additionally, the Treaty of Canandaigua between the United States and the Nation in 1794 recognized large swaths of the western part of the State as territory of the Nation. The Court in *Banner v. United States*, discussed the Treaty of Canandaigua's outline of the Nation's aboriginal territory, noting that it includes areas "south along the Niagara River through modern-day Buffalo," and Erie County.

Decision at 2 (citations and footnotes omitted).

104. Notably, in reliance on the district court decision in *Seneca Nation of Indians v. New York*, 206 F. Supp.2d 448, 508-09 (W.D.N.Y. 2002), the Decision further finds that "the Court in *Seneca Nation of Indians v. New York*, recognized the Nation's aboriginal title to the Niagara region, though the 1764 Treaties extinguished title to those lands." *Id.*

105. The Decision mischaracterizes or misunderstands the Court's finding, making the conclusion arbitrary and incorrect.

106. In *Seneca Nation*, this Court's historical analysis of the Senecas' relationship with and use and occupancy of the Niagara Islands and lands in proximity, which would include the Parcel, as set forth in more detail above, does not support the conclusion that the Senecas occupied the lands including the Parcel since "time immemorial."

107. On appeal, the Second Circuit found that the Senecas "did not permanently occupy the Niagara region, but instead used it as a seasonal hunting and fishing grounds," and other Indians also used the region as an avenue of communication and transportation. *Seneca Nation*, 382 F.3d at 249–50.

108. This Court also found that "[u]nlike other Indian land claim cases in New York, this is not a case involving an Indian tribe's ancestral homelands. The Seneca Nation's ancestral homelands were located in the Genesee Valley, not in the Niagara region and certainly not on the Niagara Islands. The Senecas' contact with the Niagara Islands was minimal, if any at all." *Seneca Nation*, 206 F. Supp. 2d at 540. The Court found that, although the Senecas hunted and fished in the Niagara region and set up temporary camps along the river, "there is no archaeological evidence that the Senecas ever even actually set foot on the Niagara Islands," and that the Senecas' claim of title to the islands in 1815 was "weak, at best." *Id.*

109. Most importantly, on this final point regarding the Nation's claim to aboriginal title to the Niagara Islands, the Court did not ever explicitly find, contrary to the Decision, that the Nation possessed aboriginal title to the Niagara region, to wit: "The language in the 1764 treaties manifests a plain and unambiguous intent on the part of the British Crown to extinguish *any title the Senecas may have had* to the northern and southern Niagara strips and the Niagara Islands." *Id.* at 509 (emphasis added).

110. Given this Court's conclusions, the Decision's reliance on this Court's decision in *Seneca Nation*, 206 F. Supp.2d 448, to conclude the Parcel is within the Nation's "aboriginal area" is not only arbitrary and capricious, but legally erroneous. Indeed, the Court's analysis of the historical record shows that the Parcel was *not* within the Senecas' aboriginal lands.

111. The Decision also found with respect to the geographic requirements of the Settlement Act that "the Grand Island Parcel is situated in near proximity to former reservation land," finding that:

> The Buffalo Creek Reservation was located "immediately adjacent to the Buffalo city limits," while the Tonawanda Reservation was located along the Tonawanda Creek. The Grand Island Parcel is located six miles from the Nation's current Niagara Falls restricted

> fee land and 16 miles from the Nation's current Buffalo Creek restricted fee lands. In 2002, the Department found that the Cities of "Niagara Falls and Buffalo are situated within or near proximity to the Nation's former Buffalo Creek and Tonawanda reservations for the purposes of the Settlement Act." Therefore, the Grand Island Parcel is situated in near proximity to former reservation land.

Decision at 3 (citations and footnotes omitted).

112. First, the evaluation of the "near" proximity of the Parcel to the former Tonawanda Reservation is plainly in error and contrary to law, namely the Settlement Act, because, as noted above, that reservation is the land of the Tonawanda Band of Seneca Indians, a separately recognized Indian nation that split from the Seneca Nation in the nineteenth century following the 1838 and 1842 Buffalo Creek treaties.

113. Further, the use of the 2002 finding of DOI in relation to the Compact that the Cities of "Niagara Falls and Buffalo are situated within or near proximity to the Nation's former Buffalo Creek and Tonawanda reservations for the purposes of the Settlement Act" and that "[t]he Grand Island Parcel is located six miles from the Nation's current Niagara Falls restricted fee land and 16 miles from the Nation's current Buffalo Creek restricted fee lands" to conclude that Grand Island is in near proximity to those reservations is bootstrapping at its worst.

114. Notably, the Decision contained no assessment of the distance, in miles, of the Parcel from the borders of the former Buffalo Creek Reservation or the Tonawanda Reservation (which, as noted above, does not qualify under the Settlement Act), did not evaluate what separates the Parcel from those reservations, and instead only assessed "near proximity" of the Parcel to other restricted fee lands of the Nation which themselves had previously been found by DOI to be in near proximity to those two reservations.

115. This does not constitute reasoned decision-making, including but not limited to, in connection with giving effect to the term "near proximity." The reasoning is perfunctory and devoid of meaningful analysis. Further, the Decision improperly interprets the term "near proximity" to include land located miles from former reservation lands, creating checkerboard jurisdiction and upon information and belief, leading to the unintended result of all or virtually all of Erie County qualifying for restricted fee status under the Settlement Act.

116. The Decision also determined that the Parcel was purchased with Settlement Act funds based on evidence that the Nation effectuated a wire transfer of the admittedly "below market value" $1.00 purchase price from an account that was purportedly the Nation's "Settlement Act account," along with purported account statements reflecting account balances. Decision at 3 & n.21.

117. Based on the Decision, DOI did not require the Nation to provide any historical accounting of Settlement Act funds, including to show that any remained, did not itself verify that any Settlement Act funds remained available, and explicitly declined to determine the fair market value of the Parcel. Nor does the Decision contain any explanation of how a self-professed donation would be considered an *acquisition* with Congressionally appropriated funds. Instead, DOI effectively took the Nation's word for it that Settlement Act funds were used in a donation because the $1.00 came from an account labeled "Settlement Act." *See id.* at 3–4.

118. As referenced in the State's November 29, 2011 letter to DOI, it has been the State's understanding that former Associate Deputy Secretary of DOI, James E. Cason, had audited Settlement Act funds to determine the balance of funds remaining and found that the funds had been fully depleted and that the fair market value of a subject property must be used in relation to acquisition purportedly made with Settlement Act funds.

119. The Decision's finding that there were any Settlement Act funds remaining and its failure to use the fair market value of the Parcel are patently inconsistent with the aforementioned findings of DOI, and ignore the historical record of the Nation's prior acquisitions under the Settlement Act, of which DOI is aware from its involvement, which exhausted those funds long before the Parcel was acquired by the Nation.

120. The Decision also does not take into account at all the potentially serious, sovereign impacts of removing the State's regulatory jurisdiction over the Parcel, where it should have, and therefore failed to consider an important aspect of the problem.

121. For reasons known only to DOI, notwithstanding the State's objection letter and its entitlement to notice under the Settlement Act of the Nation's application for restricted fee status, the State was never provided with a copy of the Decision and had to obtain it via other means.

122. As a result of the Decision, the Parcel is treated as restricted fee land subject to 25 U.S.C. § 177, which based on DOI's prior findings in 2002, makes the Parcel "Indian country," in DOI's view, thereby displacing the State's regulatory authority and jurisdiction as the Settlement Act has been construed to do. *See Citizens Against Casino Gambling in Erie Cnty.*, 802 F.3d at 283–84.

## FIRST CLAIM FOR RELIEF

### (Violation of the APA, 5 U.S.C. § 706(2)(A) and (C): The Parcel Was Not Acquired with Settlement Act Funds)

123. The State repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

124. Under 5 U.S.C. § 706(2)(A) and (C), a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law, or in excess of statutory jurisdiction, authority, or limitations.

125. Section 8(c) of the Settlement Act authorizes restricted fee status only for land "acquired by the Seneca Nation with funds appropriated pursuant to this Act." Settlement Act § 8(c), 104 Stat. at 1297.

126. The "only amounts available to carry out this Act" are "those amounts specifically appropriated by the Congress or the legislature of the State." Settlement Act § 6(e), 104 Stat. at 1296.

127. Acquisition with appropriated Settlement Act funds is a statutory condition precedent to restricted fee status, and DOI has no authority to confer that status on land that does not satisfy it.

128. As discussed above, the appropriated Settlement Act funds for land acquisition were finite – at most, $46 million comprising a $30 million Federal cash payment and a $16 million State cash payment (assuming a Federal statute may require the appropriation of State funds). Settlement Act §§ 6(b)–(c), 6(e), 104 Stat. at 1295–96.

129. Upon information and belief, the Nation thereafter expended those funds on the gaming sites and other acquisitions, and no appropriated Settlement Act funds eligible for land acquisition remained available in 2025 for the acquisition of the Parcel.

130. Further, and at a minimum, DOI could not lawfully find that the Parcel was acquired with "funds appropriated pursuant to this Act" without determining: (1) whether any appropriated funds remained; and (2) whether the funds used were appropriated funds. DOI made no determination with regard to the former and its analysis was deficient with respect to the latter.

131. DOI also ignored the State's repeated statements for over a decade that no accounting of Settlement Act funds had ever been provided and that it had serious concerns whether any funds remained. Furthermore, the State specifically informed DOI *before* the Decision that Settlement Act funds had been exhausted, that the State had repeatedly requested an accounting since at least 2011, and that no accounting had ever been provided. *See* Exhibit D at 2.

132. The Parcel was conveyed for nominal consideration of $1.00 in a transaction that the grantor and the Nation publicly described, and that the Real Property Transfer Report recorded, as a land donation. A donation is not an acquisition "with funds appropriated pursuant to" the Settlement Act. Treating a nominal payment as satisfying the statute would render the Settlement Act's finite appropriation virtually meaningless, permitting the Nation to place an unlimited amount of land in restricted fee status through the abbreviated procedure for $1.00 per parcel, contrary to the text and purpose of Section 8(c) and to the fair-market-value accounting methodology which, upon information and belief, DOI itself previously adopted.

133. The Decision also does not determine whether the balance in the account from which the $1.00 was drawn consisted of appropriated funds, investment income, reinvested proceeds, commingled monies, or funds from other sources; the Decision instead relies almost entirely on the fact that the $1.00 was drawn from an account denominated by the Nation as a "Settlement Act" account.

134. In addition, DOI failed to use the fair market value of the Parcel to determine whether Settlement Act funds were used and how much were used, which is contrary to the intent of the Settlement Act, including in relation to the opportunity for State and local comment and the *finite* funds allocated for land acquisition thereunder.

135. The failure to use fair market value for the Parcel in the Decision also threatens an infinite drain on local real property tax rolls, as well as an ever-expanding network within the State of land owned by the Nation whereby the State may be divested of jurisdiction pursuant to the Settlement Act, far beyond the limits intended by Congress.

136. DOI failed to consider these important aspects of the problem or matter before it, failed to obtain or review any accounting, failed to verify through any meaningful analysis that Settlement Act funds were used or remained available, failed to determine the fair market value of the Parcel, failed to explain any departure from its prior fair-market-value methodology, and offered no reasoned explanation for its action.

137. Indeed, DOI offered no rational explanation for its conclusion that the source-of-funds condition was satisfied and reached a conclusion that runs counter to the evidence before it.

138. The Decision is therefore arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority. 5 U.S.C. § 706(2)(A), (C).

139. By reason of the foregoing, the Decision must be held unlawful and set aside.

## SECOND CLAIM FOR RELIEF

### (Violation of the APA, 5 U.S.C. § 706(2)(A) and (C): The Parcel Does Not Satisfy the Geographic Requirements of Section 8(c) of the Settlement Act)

140. The State repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

141. Section 8(c) of the Settlement Act authorizes the abbreviated restricted fee procedure only for land that is either (i) "within [the Seneca Nation's] aboriginal area in the State" or (ii) "situated within or near proximity to former reservation land."

142. The Parcel is not within the Seneca Nation's aboriginal area in the State. As this Court found, and the Second Circuit affirmed, in litigation in which the United States participated

as a plaintiff, the Seneca Nation's ancestral homelands extended eastward from the Genesee Valley to Cayuga territory at the watershed between Seneca Lake and Cayuga Lake, not in the Niagara region and certainly not on the Niagara Islands; there is no archaeological evidence that the Senecas were ever present on Grand Island; and the Senecas did not permanently occupy the Niagara region, but instead used the Niagara region only as a seasonal hunting and fishing grounds.

143. Further, as discussed in more detail above, contrary to the finding in the Decision that the case of *Seneca Nation of Indians v. New York* determined that the Parcel was within the Nation's aboriginal area, the Court merely assumed it may have been, in the course of reaching the finding that any aboriginal title the Seneca may have had was in all events extinguished by treaties with the British Crown.

144. As noted above, the Decision's use of the former Tonawanda Reservation to measure "near proximity to former reservation land" is contrary to the Settlement Act. The Tonawanda Reservation belongs to a separate Indian nation that is not a beneficiary of the Settlement Act; thus, the Decision's citation to and reliance on the proximity of the Parcel to the Tonawanda Reservation in support of the finding that the geographic requirement of the Settlement Act was met here is without basis, contrary to the Settlement Act, and therefore contrary to law.

145. Furthermore, the Decision's conclusion that the Parcel is in near proximity to the former Buffalo Creek Reservation (and it is not even apparent that reservation qualifies as a "former reservation" under the Settlement Act) is, as discussed above, based on a flawed, perfunctory analysis by DOI and is also contrary to relevant facts that DOI should have considered.

146. The historic Buffalo Creek Reservation, extinguished in 1842, did not include Grand Island and is separated from the Parcel by the Niagara River, an international boundary waterway, and by miles of densely developed urban territory that has long been under the

jurisdiction of the State. Contrary to the Decision's finding that the Parcel is in "near proximity" to the former Buffalo Creek Reservation, it is not.

147. An interpretation of "near proximity" that would encompass an island parcel separated by an international boundary river and miles of urban territory from any former reservation would read the geographic limits that Congress added at the request of the State and local governments out of the Settlement Act, contrary to the rule against surplusage.

148. The Decision is therefore not in accordance with law and in excess of statutory authority, because the Parcel satisfies neither of the geographic predicates of Section 8(c).

149. By reason of the foregoing, the Decision must be held unlawful and set aside.

## THIRD CLAIM FOR RELIEF

**(Violation of the APA, 5 U.S.C. § 706(2)(A) and (C): The Decision Fails to Consider and Violates the Federally Approved Gaming Compact)**

150. The State repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

### A. The Compact Governs the Use of Any Remaining Settlement Act Funds

151. The Compact is a binding agreement between the Nation and the State that took effect under federal law upon the Secretary's deemed approval. Compact § 4(a); Compact Approval Letter, at 1, 7–8.

152. Sections 11(b)(4) and 11(c) of the Compact establish the exclusive framework for the Nation's use of Settlement Act funds after 2002. The Nation agreed to use "all but five million dollars" of its remaining Settlement Act funds to acquire the gaming sites, and to "dedicate" any Settlement Act funds remaining after those acquisitions "to the acquisition of parcels to meet the housing needs of the Nation's members." Compact §§ 11(b)(4), 11(c).

153. Section 11(c) imposes two conditions on any such acquisition: the parcel must be acquired "to meet the housing needs of the Nation's members," and, "[u]nless otherwise agreed by the Parties," it must be "physically and immediately contiguous and adjacent to either: (i) an existing reservation of the Nation, or (ii) the sites referenced in Paragraph 11(a)(1) and 11(a)(2) if actually acquired [*i.e.*, the casinos in Niagara Falls and Buffalo]." Compact § 11(c).

**B. The Acquisition of the Parcel Violates Sections 11(b)(4) and 11(c) of the Compact**

154. The acquisition of the Parcel with purported Settlement Act funds violates Sections 11(b)(4) and 11(c) of the Compact.

155. Upon information and belief, the Parcel was not acquired "to meet the housing needs of the Nation's members;" at a minimum, nothing the Nation has stated in relation to the Parcel, including but not limited to its notification to the State of its intention to seek restricted fee status for the Parcel (Exhibit E), stated its intent to use it for housing of the Nation's members.

156. Even if the Parcel were used for housing purposes, it still does not meet the requirements of Section 11(c): it is not physically and immediately contiguous and adjacent to any of the Nation's gaming sites or to an existing reservation of the Nation.

157. The State has not "otherwise agreed" to the acquisition of the Parcel with Settlement Act funds, to any non-housing use of such funds, or to any relaxation of the contiguity requirement. Compact §§ 11(c), 16(a).

**C. Under Either Account of the Funds, the Decision Cannot Stand**

158. If, as the State alleges in the First Claim for Relief, no appropriated Settlement Act funds remained in 2025, the Parcel was not acquired with such funds and is ineligible for restricted fee status. Settlement Act § 8(c), 104 Stat. at 1297.

159. If, alternatively, the $1.00 was drawn from appropriated Settlement Act funds remaining after the gaming site acquisitions, those funds were the funds the Nation had dedicated under Section 11(c) exclusively to qualifying housing parcels, and their use to acquire the Parcel, without any commitment to use the Parcel for housing of its members, violated the Compact. Compact §§ 11(b)(4), 11(c).

160. Either way, DOI could not lawfully conclude that the Parcel was acquired with Settlement Act funds available for that purpose. The Decision does not acknowledge, much less resolve, this dilemma; indeed, it does not account for, or address at all, the limitations placed on the Nation's use of Settlement Act funds under the Compact.

### D. DOI Was Required to Consider the Compact, and Its Failure to Do So Was Arbitrary, Capricious, an Abuse of Discretion, Not in Accordance with Law, and in Excess of Statutory Authority

161. DOI had actual knowledge of the Compact, including Sections 11(b)(4) and 11(c), and, indeed, allowed it to take effect. It reviewed those provisions in 2002 and relied on its review of the Compact in the Decision itself. Decision at 3 & n.19.

162. Having relied on its 2002 review of the Compact to find the geographic condition of the Settlement Act was satisfied here, DOI could not rationally ignore the provisions of the same Compact that limit the use of the funds on which restricted fee status depends.

163. Restricted fee status under Section 8(c) depends on acquisition with Settlement Act funds, and whether such funds were available for a particular acquisition depends on the Nation's binding, federally approved commitments concerning those funds.

164. DOI's failure to consider whether the acquisition complied with Sections 11(b)(4) and 11(c) was a failure to consider an important aspect of the problem or matter before it.

165. Further, by conferring restricted fee status on an acquisition that the Compact expressly forbids, the Decision gives federal effect to a breach of a federally approved compact and deprives the State of the benefit of its bargain thereunder.

166. The Decision is therefore arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority, and should be held unlawful and set aside. 5 U.S.C. § 706(2)(A), (C).

## FOURTH CLAIM FOR RELIEF

### (Violation of the APA, 5 U.S.C. § 706(2)(A): Failure to Adequately Consider and Respond to the State's Comments and Failure to Engage in Reasoned Decision-Making)

167. The State repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

168. Section 8(c) gives State governments a statutory right to notice and an opportunity to comment before land is placed in restricted fee status, and vests in the Secretary the authority to determine, within thirty days after the comment period, that land should not be subject to 25 U.S.C. § 177. That comment opportunity would be meaningless if DOI could disregard the comments it receives.

169. An agency acts arbitrarily and capriciously when it entirely fails to consider an important aspect of the problem, offers an explanation that runs counter to the evidence before it, or fails to respond to significant comments that, if true, would require a different result.

170. The State's January 22, 2026, comments, and the 2011 and 2016 letters attached to them, raised significant, specific, and well-documented objections that, if credited, would require DOI to determine that the Parcel should not be subject to 25 U.S.C. § 177, including that Settlement Act funds were exhausted, that DOI's own audit had so found, that a nominal-price acquisition

cannot satisfy the Settlement Act, and that no accounting had ever been provided despite repeated requests.

171. DOI did not respond to the State's comments, did not require the certified accounting the State requested, and did not obtain the information necessary to truly determine whether the statutory preconditions were satisfied. DOI has also failed, for more than fourteen years, to respond to the State's repeated requests for an accounting of Settlement Act funds, which bear directly on the availability of the abbreviated procedure.

172. By the Decision, DOI permitted a consequential change in the jurisdictional status of 207 acres of State territory without meaningfully considering the State's comments or the record before it and without any reasoned explanation. That is the antithesis of the reasoned decision-making required of federal agencies.

173. By reason of the foregoing, the Decision must be held unlawful and set aside, and the matter should be remanded to DOI with instructions to consider the State's comments and to obtain and provide to the State a certified accounting of the Nation's use of Settlement Act funds before any further action under Section 8(c).

## FIFTH CLAIM FOR RELIEF

**(Declaratory Judgment, 28 U.S.C. §§ 2201–2202: Settlement Act Land Acquisition Funds Have Been Exhausted)**

174. The State repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

175. An actual, substantial, and continuing controversy exists between the State and Defendants regarding whether funds appropriated pursuant to the Settlement Act remain available for land acquisition, and thus whether the abbreviated restricted fee procedure of Section 8(c) remains available for any acquisition by the Nation.

176. The controversy is not limited to the Parcel. The Nation has repeatedly invoked the Settlement Act's abbreviated procedure, including for the Town of Collins parcel in 2011 and 2016 and for a parcel in the City of Buffalo, referred to as the "Miami Street Parcels," in 2022, and the State has repeatedly objected that the funds were exhausted. DOI has never provided an accounting and has, upon information and belief, permitted land to be placed in restricted fee status notwithstanding the State's objections. Absent declaratory relief, the State will continue to face the removal of additional State territory from its sovereign jurisdiction through a thirty-day procedure that affords no meaningful opportunity to resolve this recurring question.

177. Upon information and belief, the funds appropriated pursuant to the Settlement Act for land acquisition have been fully expended, as measured by the fair market value of the lands acquired, and no Settlement Act funds remain available for land acquisition.

178. The State is entitled to a declaration that the funds appropriated pursuant to the Settlement Act for land acquisition have been exhausted; that no further lands may be acquired by the Nation "with funds appropriated pursuant to" the Settlement Act; and that, accordingly, no lands acquired by the Nation in the future may be placed in restricted fee status through the abbreviated procedure of Section 8(c) of the Settlement Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff State of New York respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

A. On the First Claim for Relief, declaring that the Decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority because the Parcel was not acquired with funds appropriated pursuant to

the Settlement Act as required by Section 8(c), and vacating and setting aside the Decision;

B. On the Second Claim for Relief, declaring that the Decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority because the Parcel satisfies neither of the geographic requirements of Section 8(c) of the Settlement Act, and vacating and setting aside the Decision;

C. On the Third Claim for Relief, declaring that the Decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority because the Decision failed to consider the federally approved Compact and it violates the Gaming Compact, and vacating and setting aside the Decision;

D. On the Fourth Claim for Relief, declaring that the Decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority because DOI failed to adequately consider and respond to the State's comments and failed to engage in reasoned decision-making, vacating and setting aside the Decision, and remanding to DOI with instructions to consider the State's comments and to obtain and provide to the State a certified accounting of the Nation's use of Settlement Act funds before taking any further action under Section 8(c) of the Settlement Act;

E. On the Fifth Claim for Relief, declaring that the funds appropriated pursuant to the Settlement Act for land acquisition have been exhausted, that no further lands may be acquired by the Nation with funds appropriated pursuant to the Settlement Act, and that no lands acquired by the Nation in the future may be placed in restricted fee status through the procedure set forth in Section 8(c) of the Settlement Act;

F. On each Claim for Relief, holding unlawful, vacating, and setting aside the Decision under 5 U.S.C. § 706(2);

G. Declaring that the Parcel is not, and may not be held as, restricted fee land subject to 25 U.S.C. § 177 pursuant to the Settlement Act, and that the Parcel remains subject to the sovereign and regulatory jurisdiction of the State of New York;

H. Directing Defendants to take all actions necessary to give effect to the vacatur of the Decision, including rescinding or correcting any recordation or annotation of the Parcel as restricted fee land in the records of the Bureau of Indian Affairs;

I. Enjoining Defendants from treating the Parcel as restricted fee land, on the basis of the Decision;

J. Awarding the State its costs and, to the extent permitted by law, reasonable attorneys' fees; and

K. Granting such other and further relief as the Court deems just and proper.

Dated: Buffalo, New York
November 6, 2026

**NIXON PEABODY LLP**

By: /s/ Erik A. Goergen
Erik A. Goergen
40 Fountain Plaza, Suite 500
Buffalo, NY 14202
Tel: 716-853-8118
Email: egoergen@nixonpeabody.com

Christopher J. Porzio
275 Broadhollow Road, Suite 300
Melville, NY 11747
Tel: 516-832-7500
Email: cporzio@nixonpeabody.com
(*Admission forthcoming*)

*Attorneys for Plaintiff State of New York*